Good morning, your honors. May it please the court, my name is Timothy Scott for the appellant, Mr. Yuman-Hernandez. I will endeavor to reserve two minutes for rebuttal. At the time that the offense that gave rise to this 15-year sentence occurred, Mr. Yuman-Hernandez was working for $7.50 an hour at a local car wash. He had no criminal history and he had no law enforcement contacts. He was virtually without assets and our argument will be he was utterly unpredisposed and in fact unable to carry out an offense of the magnitude in carrying the sentencing weight that the government invented in this reverse sting operation. Our argument is essentially twofold. That in rejecting Mr. Yuman's request for a downward sentence, whether it's described as a reduction or a departure in the sentence or rather a declining to impose the minimum mandatory sentence, the district court erred in two ways. One, in its legal analysis of the issue and second, in the factual findings that were made, those findings were both erroneous and insufficient as a matter of law to reject Mr. Yuman's request. Now, first, as to the legal issue. First, not only can the court decline to impose a minimum mandatory sentence when there's sentencing manipulation that seems to be afoot, but the law requires an analysis of whether that took place. The underlying principle, as it's described in our cases, in the Ninth Circuit cases, is that in a reverse sting operation in particular, a fictitious stash house robbery, the government should not be permitted to structure the fictitious crime in such a way as to maximize sentencing exposure beyond what the person would be predisposed to do and had the wherewithal to do. I'm sympathetic to the argument, I have to say, but here's one problem I have with it. If we're talking about sentencing manipulation by quantity of drugs, the quantity of drugs fictitious, of course, was well above what would have triggered the mandatory minimum. And the government says, well, we specified that larger quantity because that makes it a plausible stash house robbery because that's the likely amount that a stash house would have. How do you respond to that? I think there's two responses. I think, first, at some level, that's a difficult argument to rebut. The government says it, and so it's in the record, and I think it's difficult to imagine how we could say, no, we have firm evidence that somebody would engage in an operation like this if it was 3 kilograms or 4 kilograms. So I think at some level... Or that a typical stash house amount is under 5, right? Yes. I mean, I can't say that there's no evidence in the record because the government's agent said that, but there is no evidence in the record that supports that thing that the government agent said. No evidence other than his statement. Correct. So we have a bare assertion that that's true, and that's something we have to deal with on the field. The second response I would have to that argument or that point is that it's at most half the battle. That may be why the government selected that amount, but that still doesn't answer the question that still needs to be asked under this Court's case law, which is did the defendant have the predisposition to carry out a crime of that magnitude, and did they have the wherewithal, what's variously described as the wherewithal or the ambition or the means to commit a crime like that? Did the government help Hernandez get the rifle? Not specifically get the rifle, no. They did provide rental cars. They did provide the information about the fictitious stash house. They did provide the opportunity, the meetings, but they did not specifically provide the rifle. I will take that opportunity, though, to clarify that sometimes it's portrayed as if Mr. Uman himself retrieved a rifle or even that he exchanged marijuana for a rifle, and what the record shows is that Mr. Ramirez, who was sort of the ringleader and the first person that the government had contacted, it was his marijuana. Mr. Uman was sent essentially on an errand as a courier to pick up the marijuana and then to bring it back to Mr. Ramirez, and Mr. Ramirez then traded it for a rifle. So I don't know if that's completely dispositive, but I think it's worth pointing out. The government agent didn't even approach your client, if I understand correctly. He was recruited by what was his name, Ramirez. That's accurate, Your Honor, and that's why. I mean, so this is one of these derivative entrapment because Ramirez may have been arguably entrapped, that somehow he entrapped your client. At least in my mind there may be legal support for that, but I always find that fairly tenuous. The court is correct that it was Mr. Ramirez who first contacted my client, Mr. Uman, in this circumstance, and frankly that's why this is not a viable entrapment as a substantive defense. This is why entrapment on the merits would have been a difficult defense to run a trial. Rather, this is a sentencing entrapment, and to the best of my knowledge there is not the same prohibition on derivative entrapment in a sentencing context that there would otherwise be in a defense on the merits context. So this is a sentencing entrapment, not a derivative entrapment appeal, but I would agree that Mr. Ramirez first contacted my client. Were you the attorney at trial? I was not, Your Honor. One of the things that occurs to me, given the posture of the case as we now have it, so we've got a statement from the government witness that 15 kilos is sort of the plausible weight. It would be nice in this case, and it would be nice in future cases, if we have evidence in the record that says, no, you can get these guys to rob a stash house if you say there's one kilo. That would have been ideal. Yeah, I'd like to have some of that evidence if I were going to help you out on this one, but it's not here. I would like that evidence as well as I'm standing here. You may want to pass the word in the defense bar. I will. It sounds like maybe the word is being passed as we speak. I mean, if there is such evidence, I don't think it's as hard as you think to get it. I'm sure there are retired DEA agents who would become forensic experts in this area, assuming that this testimony is not true. Yeah, that would be the better way to handle the record below. But at the same time, on the record that we do have, that willingness to pursue a larger amount in the mind of the government still doesn't speak to Mr. Uman's predisposition. Just if I could touch upon the factual problems or the factual arguments as to the district court's findings. The district court really pointed to three things, and all of them suffer from the same problem. The district court pointed to the fact that Mr. Uman never withdrew from the conspiracy, that he appeared willing to do it, disposed to do it at the time of the offense. Second, he pointed to the marijuana transaction that I discussed with the court a moment ago. And then finally, with the fact that apparently Mr. Uman reached out to yet another person, another car wash employee, in order to carry out this offense. The problem that all of those three factors have in common is that not one of them speaks to predisposition. Every single one of them comes to light and comes to the forefront after the contact is made and after this fictitious crime is set up. None of this speaks to whether he had an interest in cocaine before, the ability to pull off a thing of this nature. But he had one last chance to get out of this. When he first meets the undercover, didn't they essentially repeat what they told Ramirez, and according to the evidence they offered the participants an opportunity to withdraw? That's what the agent said. And in fact, at one point in the record, Mr. Uman does express some hesitation. He's sort of shamed into continuing to do it. But the fact is he didn't withdraw. He never withdrew. And he could have had 100 chances to withdraw, but that's still not the issue as to predisposition. What that means is he ultimately went through with it, which will always be the case if we're standing here after the person has agreed to commit the crime. I mean, by definition, sentencing and trapment only comes to light after the person has agreed to commit the crime. Isn't it part of the factual issue of whether somebody is predisposed, their readiness to go along with the criminal activity, even if they had no prior criminal record? Respectfully, I don't think it is. And I think the Pullman case speaks to that, P-O-E-H-L meant Pullman, where the court writing in that case said that all of these things, the failure to withdraw, the willingness to do it, even the enthusiasm with which you do it, speaks to disposition, not predisposition. So long as it comes to light after the fictitious crime is set up, it's disposition, not predisposition. I see I've failed in my effort to reserve two minutes. Why don't we hear from the other side, and then we'll give you a chance to respond. Very good. Good morning, Your Honors. Rod Castro Silva for the United States. Just before I begin my argument, I wanted to clarify a couple of factual matters. In terms of the amount of cocaine in the Stash House and how that was not an arbitrary quantity, there were two witnesses who testified to that, not just the case agent. It was the case agent as well as an expert witness who testified that that was consistent with what a drug trafficking organization would have in a Stash House in the Los Angeles area. And I think that that is, so it wasn't just one witness that testified to that. And the district court certainly found that the government had not arbitrarily determined the quantity of drugs in order to increase the sentence that the defendant faced, based on that testimony and that evidence. Additionally, on the derivative entrapment, the Ninth Circuit does not recognize that as a defense. It's clear in the Ninth Circuit that a government agent has to be the one to entrap a defendant into committing a crime. And with respect to predisposition, since that was the focus of... I may have been thinking about the Second Circuit when I said that. And that's why I wanted to clarify that, Your Honor. In the Circuit, it's not the law. In terms of predisposition, the Davis case talks about, in the entrapment context, that predisposition has various factors the courts look to, including whether the government made the initial suggestion of criminal activity. In this case, not with Yuman Hernandez. Ramirez, as the court pointed out, was the one who recruited Yuman Hernandez. The government had no contact with him until Mr. Ramirez was the one who brought him to the May 19th meeting. Another factor was the activity engaged in for profit. And the evidence is clear that the purpose of taking the drugs out of that stash house was to redistribute the drugs. And there was even testimony that Ramirez was going to pay the other defendants after they participated in the robbery. So, Yuman Hernandez was driven by a profit motive. Another factor that the courts look to is, did the defendants show any reluctance? And I think the District Court properly focused on that issue. Here, there was absolutely zero evidence. And it was the appellant who bore the burden to establish that he was not predisposed. And the District Court correctly found there was zero evidence that the defendant had shown any reluctance. In fact, he was very willing to do it. There was testimony from a co-defendant that Yuman Hernandez had, amongst each other, not in front of the government agent or the informant, amongst each other had indicated some reluctance after the May 19th. And literally, all it took for him to change his mind was being called, being told by Ramirez that he was acting like a woman. And he continued on. In fact, it was after that statement of somewhat reluctance that they went out and got the rifle and got the 9mm handgun and got the handcuffs and got the police uniforms and everything else that they obtained to commit this robbery. And that Davis case notes that the most important factor is the defendant's reluctance. So I think the District Court properly focused on that when it made its findings. And in terms of inducement, which is part of the analysis in a sentencing entrapment, there was no evidence whatsoever that the government engaged in any type of threat, any type of coercive conduct, any type of harassment, any type of promises of reward or, you know, false representations that might induce the defendant to proceed. Well, no, there was an inducement or reward, 15 kilos of cocaine. Correct. Obviously, other than the fact that it was in the bag. Other than the issue in front of us, which is the quantity of drugs. You're correct, Your Honor. That was a false representation. Correct. But in terms of inducing the defendant to commit the crime, there was nothing that would have caused the defendant to coerce attacks. I think I misspoke. I apologize for that. Yes. It is one of the factors, but it is certainly not a factor. Can you just refresh my recollection for a second? What amount was necessary to trigger the mandatory minimum? Only 5 kilograms. So that's all that's required for the 10-year mandatory minimum. And here, the quantity was chosen. It's not as though the government chose 6 kilograms. It chose what is traditionally found in a drug trafficking organization's stash house, as evidenced by both the agent's testimony and the drug expert's testimony, which was not impeached at all during the trial. I mean, it seems in essence that the defense is trying to, at this point in time, the real crux of it is almost an entrapment defense that was not made at trial because of the quantity. But when these stings are successful, it just about takes the trial judge out of the sentencing picture anyway, doesn't it? Not necessarily, Your Honor. I mean, here are the guidelines. Under the guidelines, Mr. Yuman Hernandez faced a 211-month sentence on the low end, and the trial court based on that. With the mandatory minimum, the judge has to find a reason to go below the mandatory minimum, doesn't he? Correct. Once the jury has made that determination or the prior fact in a bench trial or the court in a bench trial has made a decision, beyond a reasonable doubt that that was the quantity involved, then yes, the court does not have the discretion to go below that mandatory minimum. That is correct. However, the court still has the discretion, obviously, as the court did in this case, to go below the guidelines. And that's what the prior cases pre-apprendi. Well, he did a good – the judge did a good job in this one. He went down the line and checked them all off. He was, without question, very thorough and focused on all of the issues and found in the government's view, obviously, that made the necessary findings to support his conclusion. But in fact, the judge was not unsympathetic to this defendant. That's correct. You read the sentencing transcript. I think if he had not been bound by the mandatory minimum, he might have given a lower sentence. Unknown, Your Honor. He certainly did not make any statements to suggest that. Yeah. And in fact, if the court looks at the sentence that the district court imposed on count two, which was the robbery conspiracy, which carried no mandatory minimum, he did sentence the defendant to the 120 months for that count as well, which might suggest that he felt that the crime as a whole deserved that type of a sentence. What's troublesome about these cases when we're talking about sentencing entrapment is distinct from entrapment to begin with, is the ease with which the government can do a sentencing entrapment by increasing the quantity of drugs. It's actually quite a bit of work to set up a reverse sting and do the actual entrapment for the crime. There is zero additional work to say 15 instead of 4. I think that it is – I think that may be right, Your Honor. Because I find the general proposition of sentencing entrapment – I mean, it's troublesome. On this case, we've got the evidence that this is a normal amount that a stash house would have. I think you're going to be okay. Right. But it makes me nervous that the government can increase the penalty just by saying one word rather than another. I think, Your Honor, that it's certainly – that is a concern. And the government agrees with this Court's statements in several cases where it raises that issue, in Briggs, for example, and in Schaeffer. However, the defendant certainly has the ability during the trial to raise that issue, as it would with an entrapment defense. And if it is that – Yeah, but it's going to be very hard, actually. I mean, it's possible that the defendant could have introduced – I don't know what the underlying facts are, so it may or may not be true that you could get the testimony that says, you know, it's just as customary to have two or three kilos in a stash house. But if the question is predisposition, it's going to be very hard for a defendant who's gone along with one of these things to say, you know, I was predisposed to rob a stash house for two kilos, but when you increase the possible reward, I was predisposed to do – I was not predisposed to do 15. Oh, that's a pretty hard argument. That's true, but that's – I mean, I was going to make more money, so I didn't want to do that. I think that that's the same difficulty that the defendant has with regular entrapment. I mean, I think that – and that's why I think those defenses are rare, and they rarely succeed as well because of that. So I don't know that there is much distinction between a sentencing entrapment in the drug context from an entrapment defense at trial. Do you think a 10-year sentence is a just sentence in this case for this defendant? I think Congress made that decision, Your Honor. That's not the answer – that's not an answer to that question. Me personally – I mean, as the Court knows, based on my sentencing position papers, I recommended to the Court that any – I believe any sentence between the mandatory minimum and the 211 would be a reasonable sentence. So I made my position. No, you were reasonable. I mean, you didn't do what the government often does in front of me, which is that we believe a guideline sentence is appropriate. Right. I think in this case the Court had ample three-factor considerations to go to where it went. Thank you, Your Honor. Okay. Thank you. Would you like a minute? I would appreciate just one minute, Your Honor. And I'll just respond to the discrete issue of the record that the district court made and that the district court did a good job in checking the different factors. I would point out in that context only, at the ER, pages 23 and 24, the district court, in fact, indicates that it does not believe that sentencing entrapment can take it under a minimum mandatory sentence. And so I'll just very quickly read. Unfortunately, as I understand the state of the law at this time, mandatory minimums are here to stay, and I don't know of any exception based on the sentencing factor manipulation or otherwise. Again, that's at pages 23 and 24 of the ER. So I think that it is not certain that the district court, one, recognized legally that this was a vehicle, that sentencing manipulation was a vehicle that could get under a minimum mandatory sentence. And then secondly, without repeating myself, I'll say that when it then turned to the facts, it analyzed them under the wrong legal rubric and did not focus on predisposition prior to the crime itself. Thank you. Thank you. Yuman Hernandez v. United States now submitted for decision, or rather the U.S. v. Yuman Hernandez now submitted.
judges: Korman, Goodwin, Fletcher